IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BALTIMORE COUNTY, MARYLAND :
:
v. : CIVIL NO. CCB-05-511
:
CONNECTICUT GENERAL LIFE :
INSURANCE COMPANY :

...o0o...

**MEMORANDUM**

I. Introduction

This case concerns a dispute over a life insurance policy that plaintiff Baltimore County ("the County") held with defendant Connecticut General Life Insurance Company ("Connecticut General") until August 31, 2002.  The County filed a complaint contending that it is entitled to approximately $211,000 that Connecticut General continues to hold in a reserve for "incurred but not reported" ("IBNR") claims.  Connecticut General, in return, pled a counterclaim alleging that it is still owed over $380,000 in premium payments never made by Baltimore County.  The County filed a motion to dismiss this counterclaim, on the grounds that the one-year period in which such an action can be affirmatively filed had expired.  *See* 1976 Md. Laws 450, Art. 25A, § 1A(c) ("§1A(c)").  The court dismissed the motion without prejudice, reserving judgment on the issue of whether § 1A(c) is a statute of limitations, in which case Connecticut General could probably maintain its claim as a recoupment defense, or is rather a condition on the right to sue, in which case Connecticut General would be barred entirely from asserting its claim.  *See Baltimore County v. Connecticut General Life Ins. Co.*, Civil No. 05-CCB-511, Mem. & Order of Dec. 16, 2005 (docket entry nos. 99 & 100).  The court "allow[ed] Connecticut General's

1

breach of contract claim to go forward as a provisional recoupment defense against Baltimore County." *Id.* at *3.

Connecticut General has now filed a motion for judgment on the pleadings and for summary judgment, which the County opposes. One contention in Connecticut General's motion is that it is entitled to judgment on its recoupment defense. If the court were to agree, then this litigation would be at an end, inasmuch as any money the County could potentially receive would be completely offset by the recoupment.[1] *See First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 315 (4th Cir. 1982) (remanding for entry of judgment for defendant where its valid recoupment defense exceeded plaintiff's claim). Given its finding that the County has not established a genuine issue regarding any material fact underlying Connecticut General's claim, the court need only resolve the legal question of whether Connecticut General is entitled to maintain its recoupment defense. After considering the parties' arguments and relevant Maryland case law, the court will conclude that (1) § 1A(c) should be construed as a statute of limitations, not as a condition on the right to sue, (2) Connecticut General can maintain its claim for the $381,802 as a recoupment defense, and (3) it is entitled to summary judgment on that defense. In light of these conclusions, neither party would be able to receive any recovery through this litigation. Accordingly, the case will be dismissed.

---

[1] To the extent the defendant's position is valid, it would be highly inefficient to postpone ruling on this issue until after adjudicating the other issues on summary judgment, resolving the numerous discovery disputes, and – assuming the plaintiff could proceed – holding a trial. Although resolving the recoupment issue will involve predicting how the Maryland courts would rule on an issue of state law, such pragmatic considerations support addressing the issue sooner rather than later.

II. Standard of review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to...the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

3

III. Factual background

In 1966, the County entered into a life insurance policy for its employees with the Equitable Life Assurance Society of the United States ("Equitable Life"). (Def.'s Mot., Ex. 4.) In 1991, Connecticut General acquired Equitable Life and, in 1993, it reissued the life insurance policy under its own name. (Def.'s Mot., Ex. 1.) Under the policy, the County made monthly premium payments to Connecticut General, which then allocated those premiums in several ways, including benefit claim payments, "retention" (which included costs and profits), and three reserves. One reserve, "Waiver of Premium," is not relevant to this action. The IBNR reserve was established by Connecticut General to pay claims stemming from deaths that occurred during a given policy year but were not reported until after the end of that policy year. (*See* Deposition of Robert Behler at 121; Deposition of Joseph Mock at 14-15.)[2] Finally, the Premium Stabilization Reserve ("PSR"), created under an amendment to the policy in 1970, essentially comprised those portions of the premiums that were not otherwise allocated. (*See* Def.'s Mot., Ex. 3.) Although Connecticut General held the PSR, the County could use the reserve to its advantage, essentially by making up for any shortfall between its premium payments and what it owed Connecticut General in a given year.[3] In addition, under the policy

---

[2] Exactly when and how the IBNR reserve came into effect is unclear from the record; it is not mentioned in the written policy (Def.'s Mot., Ex. 4.) On the other hand, it appears that the utility of a dedicated IBNR reserve directly flows from a life insurance company's obligation to pay for claims stemming from deaths in a given policy year, regardless of when they are reported. Maryland law currently requires that an insurance company carry adequate insurance reserves. *See* Md. Code Ann., Ins. § 5-201. The County has established such IBNR reserves for its own self-insured plans. (*See* Behler Dep. at 135-36.)

[3] More precisely, the PSR had three purposes according to Joe Mock, the County's account liaison at Connecticut General: "To cover future deficits, to forestall rate increases, or to allow the employer to take premium holidays." (Mock Dep. at 13.)

4

as amended in 1970, any money remaining in the PSR after termination and final settlement would be returned to the County.  (*See id.*).

In July 1995, Robert Behler became the County employee responsible for managing its relationship with Connecticut General over the policy.  Mr. Behler claims that at some point during 1995-97 he and Joe Mock, his liaison at Connecticut General at the time, agreed to move money from the PSR to the IBNR reserve for tax-related reasons, on the condition that the IBNR reserve would be treated like the PSR, most notably in the sense that any money remaining in the IBNR reserve after termination also would be returned to the County.[4]  (*See* Behler Dep. at 39-44.)  Connecticut General contends that no such agreement took place, or that if it did, it had no binding legal effect on the parties.  (*See* Mock Dep. at 21-22, 35-36.)  The record does reflect that between the 1993-94 and the 1994-95 policy years, the IBNR reserve increased from approximately $150,000 to around $409,000. (Pl.'s Opp'n, Ex. 2; Mock Dep. at 33-34.) Connecticut General asserts that this increase occurred because, in the 1994-95 policy year, it stopped using Equitable Life's underwriting standards on the policy and began applying its own, which mandated larger IBNR reserves.  (Mock Dep. at 27-28, 67).[5]

---

[4] Mr. Behler also contends that he mentioned the arrangement to Art Johnson, who replaced Mr. Mock in January 2000, and that Mr. Johnson made no objection to it. (Behler Dep. at 154-55.)  Mr. Johnson does not remember any such conversation.  (*See* Deposition of Arthur Johnson, at 9-10.)

[5] The court will not attempt further to resolve this factual dispute or otherwise to rule on the merits of plaintiff's claims, inasmuch as they are not ultimately relevant to the disposition of the case.  The court will, however, make several observations.  First, the plaintiff's attempt to narrow the timeframe in which the alleged conversation occurred is unavailing, given that its own witness could not even specify a year (*see* Behler Dep. at 40, 133-34) and counsel's hypothesis circularly requires acceptance of its underlying theory of the case. (Pl.'s Mot. at 11.) Second, in light of Mr. Behler's testimony, plaintiff's theory of the case raises several crucial questions.  For example, if Mr. Behler and Mr. Mock agreed to shift some indeterminate amount

In any event, the County decided to terminate its policy with Connecticut General at the end of the 2001-02 policy year, making August 31, 2002 the final date of the policy. (Def.'s Mot., Ex. 8.) In anticipation of the termination, the County did not pay its premiums for May and June 2002, which totaled $416,166.[6] After the termination, Connecticut General prepared a final accounting statement for the policy. (Def.'s Mot., Ex. 9.)[7] According to this document, the benefit charges, not including the IBNR claims, for the final year were $2,999,539; adding in the "retention" of $171,635, the total amount the County owed to Connecticut General was $3,171,174. (*Id.*) The County paid $2,065,987 in premiums during the policy year, which left an initial deficit of $1,105,187. (*See id.*) Connecticut General applied the remaining PSR balance of $723,385 to that deficit, which resulted in a final deficit of $381,802. (*Id.*)

---

of money from the PSR to the IBNR, why would the County then be entitled to receive the *entire* IBNR reserve, rather than the actual amount transferred? Given that Connecticut General was responsible for paying unreported claims stemming from the final policy year, it would not have conceivably given the entire IBNR back unless the County had assumed the risk of paying such claims (and even then, it might not have agreed to such an arrangement). Mr. Behler, however, never even asserted that this topic arose in his alleged discussion with Mr. Mock and, as defendant points out, the County made later offers to assume that risk, which also suggests that no such agreement occurred. (*See* Behler Dep. at 161-63.) Finally, although the plaintiff has submitted emails between Mr. Mock and a Connecticut General underwriter in support of its case, it fails to explain why Mr. Mock would express surprise at the $259,000 increase in the IBNR in an internal email if he himself had orchestrated that increase. (*See* Pl.'s Opp'n, Ex. 2.) If, alternatively, Mr. Mock made this discovery before his alleged discussion with Mr. Behler, it is doubtful that he could have credibly proposed to move money into the IBNR that he knew was there already. These considerations undermine the plausibility of the plaintiff's allegations.

[6] Mr. Behler testified that the County took these "premium holidays" in order to deplete the PSR balance, because he preferred that course to receiving a lump sum payment of the PSR balance after termination. When he realized that the PSR balance would not be sufficient to cover July and August 2002 as well, the County paid the premiums for those months. (*See* Behler Dep. at 165-69.)

[7] The County complains that Connecticut General was dilatory in preparing and sending this financial statement, but this issue is not relevant to its accuracy.

Connecticut General first demanded payment of this deficit by the County in November 2002 (although the figure cited was $382,203 based on provisional calculations). (*See* Def.'s Mot., Ex. 10.)  Connecticut General sent letters in January 2003 and October 2004 demanding the unpaid May and June 2002 premiums totaling $416,166 (Def.'s Mot., Exs. 11, 12), but returned to the $381,802 figure in a November 2004 letter. (*Id.*, Ex. 13.)

As for the IBNR reserve, Connecticut General's figures show that it paid $328,844 in unreported claims for the final policy year, reducing the reserves from $540,087 to $211,243. (See Def.'s Mot., Ex. 9.)  The County claims that it is entitled to this $211,243, whereas Connecticut General maintains that it is entitled to keep this money to offset any risk of future unreported claims stemming from the final policy year.[8]

The County has not seriously disputed the accuracy of Connecticut General's figures, nor generally that there was a deficit at the final settlement that it owed Connecticut General.  The County contends that it needs to depose Connecticut General's corporate designee in order to inquire into the accuracy of the figures. *See* Pl.'s Motion to Compel (docket entry no. 98), Ex. 1, #15; Pl.'s Opp'n at 5 n.4.  However, the County first received Connecticut General's calculations, at least in provisional form, in November 2002, and has received comprehensive documentation of Connecticut General's annual statements through discovery (*see* Def.'s Rep.,

---

[8] On the one hand, it does seem problematic that Connecticut General would keep $211,243 for the highly unlikely prospect that any new unreported claims stemming from the 2001-02 policy year will come "out of the woodwork." (*See* Behler Dep. at 76.)  On the other hand, the County acknowledged such a contingency could still occur. (*Id.*)  Calculating IBNR reserves appears to be a highly complex and speculative process, and any prediction of future risk always carries the possibility of over- or under-predicting the correct amount of money needed. (*See* Johnson Dep. at 62-64.)  Furthermore, the County had sufficient opportunities to challenge Connecticut General's IBNR standards since the reserve increased in 1995, but there is no evidence in the record that the County ever did so prior to this litigation.

7

at 23 n.18), but has never raised a valid basis for challenging those figures.[9] In addition, the County has consistently relied on a spreadsheet created by Mr. Behler that is in substantial agreement with Connecticut General's figures. *See* Pl.'s Opp'n, Ex. 3 (listing, for the relevant year, $2,999,539 in benefit claims, $2,065,987 in premium paid, $723,385 in the PSR, and $211,243 remaining in the IBNR); Behler Dep. at 70; Mock Dep. at 25-26.[10] Accordingly, the court finds no genuine dispute that, at the termination of the policy, the County owed Connecticut General $382,203.[11]

---

[9] Although the plaintiff contends under Rule 56(f) that it is entitled to additional discovery, the court rejects that argument at least as it pertains to the factual basis for the defendant's recoupment defense, given that the County has had "adequate opportunity to complete discovery" as to that issue. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995) (affirming refusal to allow discovery after motion for summary judgment was filed where non-moving party had "adequate opportunity to complete discovery"). Although the plaintiff filed a motion to compel the defendant's Fed.R.Civ.P. 30(b)(6) deposition (docket entry no. 98), the County noticed that deposition after the deadline set by the court's scheduling order, without having moved for an amended scheduling order. That motion will be denied.

[10] At several points in his deposition, Mr. Behler seemed to be making the confusing suggestion that the final figure of $211,243 in the IBNR reserves already accounted for a deduction of the $382,203 deficit from the IBNR reserves. (*See* Behler Dep. at 77, 149-50, 187-88.) However, Connecticut General's financial statement clearly reflects that $328,844 in unreported claims were paid for the final policy year. (*See* Def.'s Mot., Ex. 9) (showing that a total of $3,316,681 was paid for claims for the year, reflecting $2,999,539 in reported claims and $328,844 in unreported claims). Given that the IBNR reserves prior to the year were $540,087, the payment of $328,844 left $211,243 in the account. Had the deficit of $382,203 instead been applied against the original $540,087 in the IBNR reserves, only $157,884 would have remained.

[11] This conclusion ignores the separate question whether the $211,243 in the IBNR should have been applied against that deficit at termination. Solely viewing the merits and disregarding procedural issues, the court notes that even if the plaintiff were correct that it was entitled to the $211,243 at termination, that money should have been credited against the $382,203, meaning that the County still would have owed Connecticut General a sum of $170,960. The County is now, in essence, hoping to benefit from the disparity in limitations periods by recovering $211,243 while simultaneously avoiding the payment of $382,203 that it owed Connecticut General at termination. From this perspective, the County can hardly view the final result of this case, with neither party receiving any money, as an inequitable result. In

8

III. Section 1A(c)

In the court's earlier ruling, the court rejected the defendant's invitation to question the legitimacy of § 1A(c), either facially or as applied to its counterclaim.[12] As the court noted:

> While the Maryland Court of Appeals has not considered a direct challenge to Art. 25A, § 1A, the court thoroughly analyzed its structure and legislative history in *Baltimore County v. RTKL Associates, Inc.*, 846 A.2d 433 (Md. 2004), and did not question its validity as to claims brought against a county.  *See id.* at 435-40.

Civil No. 05-CCB-511, Mem. of Dec. 16, 2005. Nonetheless, the court left open the separate question of whether § 1A(c) is a procedural statute of limitations or a substantive condition on the right to sue, which has now become a dispositive issue.

In *State v. Sharafeldin*, 854 A.2d 1208 (Md. 2004), the Court of Appeals considered whether Md. Ann. Code, State Gov't, § 12-202 ("SG § 12-202"), the analogous provision applying to the State of Maryland, is a condition on the right to sue or a statute of limitations, and concluded that it is the former. *Id.* at 1219.[13]  The plaintiff contends that the Court of

---

addition, Connecticut General continues to bear the risk of any new unreported claims, however slim.

[12] Art. 25, § 1A(c) reads: "A claim is barred unless the claimant files suit within one year from the date on which the claim arose or within one year after completion of the contract giving rise to the claim, whichever is later." The Court of Appeals has held that this provision, which could potentially be read as applying to *every* breach of contract claim, must be read in the context of § 1A, which narrowly applies to breach of contract claims against a chartered county of Maryland. *Baltimore County v. RTKL Associates, Inc.*, 846 A.2d 433, 438-40 (Md. 2004).

[13] SG § 12-201 "conditionally waived the State's sovereign immunity in actions filed in Maryland courts for breach of a written contract." *Sharafeldin*, 854 A.2d at 1209.  SG § 12-202 then added the condition that "[a] claim under this subtitle is barred unless the claimant files suit within 1 year after the later of: (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim." In *RTKL*, the court wrote in a footnote that the issue of "whether Art. 25A, § 1A(c) and its counterparts applicable to actions against the State and other political subdivisions of the State are true statutes of limitations or conditions on the right to sue...is before us in another case." 846 A.2d at 437 n.1. Although the court was presumably referring to *Sharafeldin*, the court there only addressed that question as to § 12-202, and made no

Appeals would come to the same conclusion as to § 1A(c), whereas the defendant argues that Maryland's highest court would come to the opposite conclusion in this context. In order to explain why the court agrees with the defendant, it must carefully examine the rationale of the Court of Appeals' decision in *Sharafeldin*.

First, the Court of Appeals stated the general proposition that to construe SG § 12-202, it needed to determine the legislative intent behind the provision. 854 A.2d at 1212. Because "[t]he mere wording of SG § 12-202 does not inform us clearly of what the Legislature intended in this regard," *id.* at 1213, the court needed to turn "to other indicia of that intent, including the title to the bill, the structure of the statute, the inter-relationship of its various provisions, its legislative history, its general purpose, and the relative rationality and legal effect of various competing constructions." *Id*. at 1212-13 (quoting *RTKL*, 846 A.2d at 437-38).

The court started this inquiry by noting that SG § 12-202 was enacted as part of legislation that was intended, in part, to waive the State's sovereign immunity for contract actions, subject to several limitations, including a one-year period to file such an action. *Id.* at 1213.[14]  Focusing on whether the one-year period of SG § 12-202 could be waived by a state agency, the court stated that "immunity from suit is 'one of the highest attributes of sovereignty,' and that any waiver of that immunity must come from the Legislature." *Id.* at 1214 (citing cases). All of the Court of Appeals' observations and rationales in *Sharafeldin* were expressed against the backdrop of this crucial finding that SG § 12-202 was enacted to alter the State's

---

comment on the status of § 1A(c) or its other counterparts.

[14] The court noted that the reference in the legislative history to "limitations" was made in a general descriptive sense, not in the technical sense of a true statute of limitations. *Id.*

10

sovereign immunity for contract actions under common law. *See id.* at 1213-15.[15]

By contrast, the Court of Appeals has repeatedly emphasized that chartered counties, such as Baltimore County, have never enjoyed sovereign immunity in breach of contract actions. *See RTKL*, 846 A.2d at 436; *Montgomery Cty. v. Revere*, 671 A.2d 1, 10 (1996) ("Maryland law has never recognized the defense of governmental immunity in contract actions against counties and municipalities."); *Harford Co. v. Bel Air*, 704 A.2d 421, 425 (1998). Accordingly, the court has noted that although the Maryland legislature purported to waive such immunity for counties through Art. 25A, § 1A, it acted based on a mistaken legal assumption. *See RTKL*, 846 A.2d 436; *Sharafeldin*, 854 A.2d at 1213 n.3. Although such a mistake would not necessarily lead to the conclusion that § 1A is invalid, the Court of Appeals would likely take this background into consideration when construing § 1A. *See Kaczorowski v. Mayor of Baltimore*, 525 A.2d 628, 635 (Md. 1987) (construing statute to avoid an "absurd result" at odds with its underlying legislative purpose); *see also RTKL*, 846 A.2d at 676 (noting that one of the legislation's "Whereas" clauses states that "there exists a moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract").

Turning back to *Sharafeldin*, the court next noted that the text of the provision, providing that a contract claim against the state is "barred" if not brought within a year, is not worded like traditional statutes of limitations, which normally state that an action "shall be filed within" the available period. 854 A.2d at 1214 (citing statutes). This wording, the court concluded, "was intended to preserve the effect of sovereign immunity itself, which barred the action entirely."

---

[15] For example, the court explicitly clarified that the issue in the case "involves the State's immunity from suit, not the jurisdiction of the court." *Id.* at 1215 n.5.

*Id.*[16] Although § 1A(c) similarly provides that a contract action against a county is "barred" if not brought within a year, such wording could not be read to "preserve" the effect of an immunity that did not exist in the first place.[17] Indeed, the court in *Sharafeldin* framed its observation on the wording of the text merely as support for its primary finding that the legislature intended only to waive the State's sovereign immunity for that limited one-year period; the textual analysis was not alone a sufficient basis for the court's ultimate conclusion. In other words, although one of the County's strongest arguments for asserting that the Court of Appeals would interpret § 1A(c) *in pari materia* with SG § 12-202 is that they are almost identically worded, the *Sharafeldin* court emphasized that the text of SG § 12-202 is ambiguous on this question and could only be construed properly in light of the particular context and background of the provision.

Finally, the court in *Sharafeldin* invoked the principle that "where a statute creates a new cause of action and fixes a time within which a suit under the statute must be filed, '[t]he time within which the suit must be brought operates as a limitation of the liability itself as created, and not of the remedy alone.'" *Id.* at 1218 (citing *The Harrisburg*, 119 U.S. 199, 214 (1886)).

---

[16] The Court of Appeals supported this conclusion through a lengthy examination of how federal courts have interpreted similarly worded federal statutes, in order to divine the Maryland legislature's frame of reference when it enacted SG § 12-202. *See id.* at 1215-18 (concluding that "when the Legislature first waived immunity in contract action in 1976 and later re-enacted that waiver as part of the State Government Article, the Federal decisions, including the Supreme Court's decision in *Soriano*, were nearly all to the effect that the analogous time limitations were, indeed, conditions to the waiver of immunity and were not subject to waiver or tolling").

[17] Furthermore, the defendant correctly observes that § 1A cannot be read to change the common law – i.e., by bestowing sovereign immunity on counties in contract actions if not sued within one year – through implication, and the County has not advanced such an argument. *See Hardy v. State*, 482 A.2d 474, 478 (Md. 1984) ("Maryland courts adhere to the policy that statutes are not to be construed to alter the common-law by implication.") (citing cases).

The court suggested that, as a "conditional waiver of the State's sovereign immunity in contract actions," SG §§ 12-201 and 12-202 created a new cause of action for breach of contract against the state that had previously not existed. *Id.* at 1219. Thus, the provision limited the State's liability itself, and not merely the available remedy. Such reasoning could not be applied to § 1A, inasmuch as a cause of action against a county for breach of contract preexisted the statute's enactment, even if the legislature assumed otherwise. *See, e.g., Cohen v. Baltimore County*, 185 A.2d 185 (Md. 1962). Thus, Art. 25, § 1A, like a traditional statute of limitations, could not be read as "deny[ing] the plaintiff's right of action, but only the exercise of the right." *Sharafeldin*, 854 A.2d at 1214 (quoting *Foos v. Steinberg* 230 A.2d 79, 80 (Md. 1967)).

In sum, due to the crucial difference between the immunity of the State and that of its counties, the court is persuaded that the Court of Appeals, were it presented with the question in this case, would distinguish *Sharafeldin* and construe § 1A(c) to be a statute of limitations. Construing it otherwise would lead to the "absurd result" of granting counties, through implication and legislative mistake, more immunity than they possessed at common law. *See Kaczorowski*, 525 A.2d at 635; *Hardy*, 482 A.2d at 478.

Finally, there remains the question whether Connecticut General can maintain its counterclaim as a recoupment defense even though the statute of limitations has passed. Although, as the plaintiff acknowledges, the Court of Appeals has not ruled directly on this question, it has signaled its approval of the well-established principle. *See Imbesi v. Carpenter Realty Corp.*, 744 A.2d 549, 557 (Md. 2000) (quoting *Minex Resources, Inc. v. Morland*, 467 N.W.2d 691, 699 (N.D. 1991)) (noting that a recoupment can only be used to reduce or avoid the

13

plaintiff's recovery, and not as the basis for affirmative relief).[18]  The County has raised no opposition to this principle, and the court does not entertain any serious doubts as to its validity under Maryland law.  *See* John A. Lynch, Jr. & Richard W. Bourne, MODERN MARYLAND CIVIL PROCEDURE § 4.4(c) (2d ed. 2004) ("[A] counterclaim that could be regarded as a recoupment should probably be treated as timely if the complaint is filed within the statute of limitations."); *Reiter v. Cooper*, 507 U.S. 258, 264 (1993) ("Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely.").[19]

IV. Conclusion

In light of the reasoning above, Connecticut General can maintain a recoupment defense in this action, and it is entitled to summary judgment in its favor on that defense.  Because the amount Connecticut General is owed, $381,802, would exceed any potential recovery by the

---

[18] The Court of Appeals has likewise not addressed whether a condition on the right to sue would bar such a recoupment, but this principle would be a logical implication of its decision in *Sharafeldin*.  *See also Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 415-16 (1998) (holding statute to be a condition on the right to sue and disallowing recoupment).

[19] The County does, however, challenge the characterization of Connecticut General's claim as a recoupment defense, arguing that it is instead a set-off defense.  As explained in the court's earlier opinion in this case, a recoupment defense is "based on circumstances arising out of the same transaction on which the adversary's claim is based," whereas a set-off arises out of a different transaction.  *Imbesi*, 744 A.2d at 552.  A set-off defense based on an otherwise time-barred claim could not be maintained, unlike a recoupment defense.  The court is not persuaded by the County's argument that the IBNR reserve was a separate "transaction" from the unpaid premiums.  The "transaction" at issue here is the termination of the life insurance policy, from which both disputes have arisen.  *See First Nat'l Bank of Louisville*, 693 F.2d at 310 n.1 (counterclaim is for recoupment when it arises from same contract giving rise to plaintiff's claim). The court therefore will not reverse its earlier conclusion that Connecticut General's claim takes the form of a recoupment defense.

County, the court will grant an entry of judgment in the defendant's favor.[20]  *See First Nat'l Bank of Louisville*, 693 F.2d at 315.

A separate Order follows.[21]

July 14, 2006                                         /s/

Date                                                        Catherine C. Blake
                                                                United States District Judge

---

[20] The plaintiff's complaint included a claim for $3 million in punitive damages stemming from the fraud claim, which would exceed the recoupment defense. However, Maryland law requires a showing of "actual malice" in order to recover punitive damages in a tort action. *See Biktasheva v. Red Square Sports, Inc.*, 366 F.Supp.2d 289, 295 (D.Md. 2005) (citing *Montgomery Ward v. Wilson*, 664 A.2d 916, 930 n. 5 (1995)). Even if the County could succeed on its fraud claim – a doubtful proposition – the County has proffered no evidence whatsoever of actual malice, and thus could not obtain punitive damages.

[21] In light of the above conclusions, the plaintiff's motion to file a third amended complaint (docket entry no. 114) will be denied as moot, to the extent the proposed new complaint does not validly seek any additional money beyond the $211,243 in the IBNR reserve. The plaintiff's motion to compel regarding its additional document requests (docket entry no. 108) and its motion for leave to file more than thirty document requests (docket entry no. 118) will be denied as moot, given that none of the additional document requests are relevant to the defendant's recoupment defense. The defendant's motion to compel regarding its interrogatories (docket entry no. 88) also will be denied as moot.